# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 19, 2013 Session

## STATE OF TENNESSEE v. BENJAMIN KEITH FOWLER

**Appeal from the Criminal Court for Knox County**
**No. 95397      Jon Kerry Blackwood, Senior Judge**

---

**No. E2012-02627-CCA-R3-CD - Filed March 5, 2014**

---

A Knox County Criminal Court jury convicted the defendant, Benjamin Keith Fowler, of six counts of first degree felony murder, two counts of criminally negligent homicide, two counts of especially aggravated burglary, one count of attempted aggravated robbery, and one count of employing a firearm during the commission of a dangerous felony. The trial court merged the homicide verdicts and imposed two convictions of first degree murder. The court also merged the especially aggravated burglary verdicts and imposed a single conviction of that offense. In this appeal, the defendant contends that prosecutorial misconduct and the behavior of a State witness deprived him of the right to a fair trial, that the trial court erred by admitting certain testimony, and that the trial court erred by prohibiting the admission of certain evidence. Although we discern no error with regard to the issues presented by the defendant, we observe plain error with regard to the defendant's conviction of especially aggravated burglary. Because dual convictions for first degree felony murder and especially aggravated burglary in this case are prohibited by statute, the defendant's conviction of especially aggravated burglary is modified to a conviction of aggravated burglary and remanded to the trial court for resentencing. The judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Benjamin Keith Fowler.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin Allen, Assistant District

Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions in this case stem from his role in the July 24, 2010 invasion of the home of Layron Doyal. Mr. Doyal's fianceé, Judy Adams, and his son, Robert Doyal, were killed during the invasion, as was the defendant's compatriot, Ronald Carter.

At trial, Layron Doyal, a Vietnam War veteran, testified that he became "totally disabled" in 2004, bringing an end to his decades-long career in law enforcement. He said that as a result of lingering issues related to an injury he received during the Tet Offensive and the injuries he received in a 1977 car accident, he had undergone six orthopedic surgeries. In addition, he had undergone two ablation procedures and received three stints to treat the clogging of his arteries. He said that he suffered from chronic obstructive pulmonary disease, diabetes, cardiac artery disease, acid reflux, pancreatitis, carpal tunnel syndrome, and neuropathy. Mr. Doyal said that, as a result of his various ailments, he suffered from a great deal of pain on a daily basis and that he was prescribed pain medication to treat that pain.

Mr. Doyal testified that Ms. Adams, who had lived with him for five years, also suffered from serious health issues, including back injuries and "breathing problems" that prevented her from sleeping in a bed and significantly reduced the amount of help she could contribute to household upkeep. He said that his son, Robert Doyal, also suffered from poor health attributable to a serious car accident that almost cost the younger Mr. Doyal his life. Both Ms. Adams and Robert Doyal also took prescribed pain medication. According to Mr. Doyal, as a result of the family members' significant health issues, he decided to take the defendant on as a tenant. He said that he agreed to let the defendant and his girlfriend live in the finished basement of Mr. Doyal's South Knoxville residence in exchange for the defendant's agreeing to perform "a minimum of 20 hours a week" of work around the house and to contribute "$200 a month in grocery items."

Mr. Doyal testified that the defendant lived in the basement for only 11 days before moving out and that they did not part on friendly terms. He said that while the defendant lived in the house, he inquired about purchasing some of Mr. Doyal's pain medication, and Mr. Doyal responded, "Sure. Bend over. I'll shove it right up your you know what." Mr. Doyal testified that by the time the defendant moved out, Robert Doyal "hated him worse than [did Ms. Adams] or [Mr. Doyal] put together." He said that after the defendant moved out, he did not see the defendant again until the preliminary hearing in this case.

-2-

Mr. Doyal recalled that on July 23, 2010, he went into his room "just to rest for a few minutes about 10:30" p.m. and that he "dosed off." Ms. Adams "was in her recliner in the living room," and Robert Doyal was in his own bedroom. Mr. Doyal said that he was awakened after midnight by "the loudest sound . . . since Vietnam." He said that he recognized the sound instantly as two shotgun blasts and immediately armed himself with the loaded pistol that he kept on the night stand. Thinking that someone "had blasted their way into the house," Mr. Doyal walked to his bedroom door, stuck his hand out into the hallway, and "fired five or six random shots, because, [he] . . . could hear somebody coming . . . real heavy." After firing the shots, Mr. Doyal "heard the thump, and then looked out and saw [the] complete body" of the perpetrator. The perpetrator "let off a shot" that "blew the entire door frame" of a louvered closet door "all to pieces." The man then began "trying to kick his way" into Ms. Adams' sewing room, where the family computer was located.

The man eventually succeeded in getting into the room and closing the door. Mr. Doyal followed and fired "five or six shots through that door toward the ground" before opening the door. Inside the room, he saw the man crawling away from the door with his mask pulled up, revealing his face. Mr. Doyal said that the "old cop" in him prompted him to ask the man, "'Who sent you?'". The man smiled at him and said, "'I'm a friend of Benji's.'" Mr. Doyal said that the name Benji "didn't even ring a bell to" him because he had called the defendant "'Ben'" and had not known him to use the nickname Benji.

Mr. Doyal recalled that the perpetrator was blocking his access to the telephone, so Mr. Doyal "put a round right in his head" so that he could get to the telephone and call 9-1-1. After picking up the telephone, Mr. Doyal walked into the living room, where he saw Ms. Adams "sitting indian style directly in front of her recliner . . . already gone, dead." Robert Doyal lay near the entertainment center, alive but bleeding copiously. Mr. Doyal recalled that Robert Doyal tried to speak, but Mr. Doyal told him to "hang on" while he looked for other perpetrators. Mr. Doyal said that he never saw any other perpetrator inside the house. He then "stepped through the storm door," which "had already been shot out and went out in the yard looking around." The only person he saw outside was his neighbor Mark, whom he asked to telephone 9-1-1. Mr. Doyal said that when he returned to the living room, Robert Doyal was dead. Mr. Doyal described Robert Doyal as a hero, saying, "[I]f he had [not] blocked that door for just that half of a second, I wouldn't be alive. Just . . . him delaying that bastard . . . ."

Mr. Doyal recalled that during the time that the defendant lived in his residence, he did not display his handgun to the defendant. Mr. Doyal said that the handgun he used to shoot Mr. Carter was the only gun he owned at the time of the shooting. Mr. Doyal said that he found a Mossberg 500 shotgun "lying in the floor next to where the . . . other murderer was trying to kick his way into the bedroom." Mr. Doyal said that he either

-3-

kicked the gun out of the way or picked it up and rested it against the dining room table, but he could not recall precisely which he had done.

During cross-examination, Mr. Doyal said that he paid the defendant in cash for any work he performed in excess of the agreed-upon 20 hours per week and for some work the defendant performed for Mr. Doyal's sister. Mr. Doyal acknowledged that he did not keep large amounts of cash in his home because Robert Doyal would take it. He agreed that Robert Doyal had a "serious drug problem" and that Robert Doyal had attempted suicide on more that one occasion. He also conceded that he had called police on one occasion when Robert Doyal stole his pain medication. He denied keeping his medication in a safe deposit box at the time of the offenses. Mr. Doyal acknowledged calling Mark McKinney, the man who had introduced him to the defendant, in the early morning hours after the shooting and telling him that Ms. Adams and Robert Doyal were dead. Mr. Doyal said that he made the call because Mr. McKinney "was basically the only friend that" Mr. Doyal had, and he denied accusing Mr. McKinney of the murders. Mr. Doyal also denied finding a piece of paper with Mr. McKinney's telephone number on the floor of his house after the shooting. Similarly, he said that he did not find Robert Doyal's cellular telephone on the floor open with Mr. McKinney's name and number illuminated.

Jay Stanley Bird, III, testified that he lived across the street from Mr. Doyal. On July 24, 2010, he heard "what sounded to be like fireworks from across the street." He said that he went outside to see if he could discern the direction from which the popping sounds had come, and he concluded that they had originated "directly at Mr. Doyal's house." Mr. Bird said that he did not see "any lights or people or anything" but did see a dark colored, four-door sedan parked behind one of the bushes at the front of his house. After the shots ended, Mr. Bird "saw the car back up, pull into a neighbor's driveway backwards and turn its headlights on and speed off the opposite direction."

Patrick Alexander testified that he and his family visited his mother-in-law, Melissa Smith, in July 2010. The defendant, whom he knew as Benji, was the boyfriend of his wife's 18-year-old sister. He said that the defendant drove a "[b]urgandy-ish," four-door Dodge Intrepid. Mr. Alexander recalled that the defendant and his friend, Ronnie Carter, came and went from the apartment several times during Mr. Alexander's two-week stay. On the Wednesday or Thursday before the shooting, the defendant said that he had something he wanted to show Mr. Alexander, then he opened the trunk of the Intrepid "and popped out a 12-gauge." Mr. Alexander said that he picked up the 12-gauge shotgun, looked at it, and deemed it "a nice gun." He recalled that the weapon was loaded with "green low-brass shells." The defendant also showed Mr. Alexander a .22 caliber pistol that was in the glove box of the car. That gun was also loaded.

-4-

Mr. Alexander testified that on the night of the shooting, the defendant and Mr. Carter came to Melissa Smith's residence "dressed in all black." He recalled that the defendant "was running around looking inside the apartment for a black bandana" but eventually "grabbed a hat and took off with a hat." Mr. Alexander said that after the defendant left, Mr. Alexander went to bed. He was awakened by his brother-in-law and his wife "screaming for [him] to get downstairs." When Mr. Alexander got downstairs, he went outside, where he found the defendant "leaning over the hood of the Intrepid, screaming" that he had been shot.

Mr. Alexander helped the defendant inside and then undressed the defendant to find the gunshot wound. He recalled that the defendant "was bleeding from his lower leg on the left-hand side just behind his knee, and also right above his buttocks at the left side." The defendant did not offer any explanation for his having been shot and begged Mr. Alexander not to telephone police. Mr. Alexander said that the defendant "kept screaming, 'Don't call the police. Let me use the phone and call my brother. I got to get out of Knox County.'" The defendant asked Mr. Alexander to "find the bullet," and Mr. Alexander showed him that it was a through-and-through wound. When Mr. Alexander asked the defendant what had happened, the defendant said, "'That b[****] shot me.'"

Within a short time, the defendant's brother, James Cannon, Jr., arrived and drove the defendant away in his Chevy truck. Before they left, Mr. Alexander heard the defendant say, "'Help me up, get me dressed, get me out of here. I got to get out of Knox County tonight.'" After they left, Melissa Smith backed the defendant's Dodge Intrepid into a parking spot. At that point, Mr. Alexander said, he and his wife became concerned for Mr. Carter because the defendant "left with Ronnie [but] showed up by himself with a bullet wound." Mr. Alexander said that they had asked the defendant about Mr. Carter, and he had said that they should not worry about Mr. Carter. Because of their concerns, Mr. Alexander and Melissa Smith drove to Mr. Carter's residence and spoke with the woman who answered the door. That woman told them that Mr. Carter had left early that morning with his girlfriend and had not returned. Mr. Alexander and Ms. Smith then returned to Ms. Smith's apartment and telephoned police.

Donna Alexander, Mr. Alexander's wife, testified that she met the defendant for the first time when she came with her husband and children to visit her mother. During the time that she was visiting her mother, she socialized with the defendant and his friend, Ronnie Carter, "a good bit." She observed the defendant and Mr. Carter coming and going from her mother's residence in a maroon Intrepid.

On the night of the shooting, the defendant and Mr. Carter arrived sometime after 9:30 p.m., and the defendant changed from his denim shorts and light colored t-shirt

into black jeans and a black t-shirt. She said that the defendant specifically asked Melissa Smith to provide him with a black t-shirt. Mr. Carter was dressed in a long-sleeved black t-shirt and black pants. Both men wore black shoes, and both spent time looking for a black bandana. Before the men left, Ms. Alexander overheard Ms. Smith ask the defendant if he would be returning to the apartment that evening. When the defendant responded that he would be back and that he would bring Ms. Smith a Coca-Cola, Ms. Smith asked, "'What about the other?'" The defendant responded, "'I'll bring you something back.'"

After the defendant and Mr. Carter left, she and Mr. Alexander went to bed. At approximately 1:00 a.m., her brother woke her up and said, "'Benji needs Patrick.'" She and Mr. Alexander got up and went downstairs. They found the defendant "leaned over the side of the Intrepid." Ms. Alexander confirmed Mr. Alexander's recitation of the events that followed the wounded defendant's return to Ms. Smith's residence.

Melissa Smith testified that in July 2010 her 18-year-old daughter was dating the 35-year-old defendant and that the defendant lived with them. On the night of the shooting, the defendant and Mr. Carter, who was dressed in a black turtleneck and black pants, came to her residence so that the defendant could change clothes. She recalled that the defendant put on black pants and asked her to provide him with a black shirt, and she complied. She said that the shirt she gave him had white lettering on the front. After he got dressed, the defendant told her that he and Mr. Carter were going out to a bar, and she asked the defendant to bring her a Coca-Cola and "some of the other" when they returned. She explained that asking for "the other" was a request for the defendant to bring her prescription pain killers. The defendant indicated to her that he would bring her some when he returned to the apartment later that same evening.

At approximately 1:00 a.m., she was watching television in the living room with her 12-year-old son when her son indicated that the defendant had returned. Her son walked onto the porch, and she overheard the defendant tell him to go get Mr. Alexander. Her son complied, and Ms. Smith went onto the porch. She confirmed the account of the events that followed that was provided by Mr. and Mrs. Alexander, including the defendant's insistence that they not call authorities and that he had "to get out of Knox County." She added, however, that she noticed that the defendant was wearing the shirt she had given him inside out so that the white lettering was not showing.

Knox County Sheriff's Office Officer Chadwick H. Capley, who was the first officer to arrive at Mr. Doyal's residence on July 24, 2010, testified that upon his arrival, he saw that "the front glass had been busted out of the storm door, and there was actually a person lying on the floor at the doorway of the house." He then saw Mr. Doyal standing just inside the doorway with "a telephone in one hand talking to 911, and a gun in the other." Mr.

Capley drew his weapon and ordered Mr. Doyal to put down the gun, and Mr. Doyal quickly unloaded the weapon and placed it on a television stand. Officer Chadwick went into the house and checked the condition of the female victim who lay near the front door and a male victim who lay in a back bedroom.

Officers photographed and collected numerous items of evidence, including a 12-gauge shotgun shell casing from between two cars parked in the driveway and a pair of latex gloves that lay next to another 12-gauge shell casing in the driveway. Four other shell casings were collected from inside the Doyal residence, one from the dining room and one from the hallway. Officers collected a Mossberg 500 12-gauge shotgun from the dining room and a Glock .40 caliber pistol from the television stand. From inside the Dodge Intrepid seized from the Montgomery Village apartments, officers collected bloody clothing, an open box of 12-gauge shotgun shells, a latex glove, a pair of "knee high nylon stockings," and swabs of blood stains. Deoxyribonucleic acid on a blue ball cap recovered in the living room of the Doyal residence belonged to the defendant.

Tennessee Bureau of Investigation Special Agent and Forensic Scientist J. Russell Davis, II, testified that the gloves found in the driveway of the Doyal residence and the blue ball cap found in the dining room of the Doyal residence tested positive for the presence of gunshot primer residue. Microscopic analysis of the defendant's shoes "revealed the presence of particles consistent with gunshot primer residue," but those particles could not "be identified as unique to gunshot primer residue." Examination of glass shards taken from the defendant's shoes showed that the shards were consistent with the glass shattered from the front door of the Doyal residence.

The parties agreed to the admission of the autopsy reports in the absence of the medical examiner's testimony. The autopsy of Mr. Carter established that he was shot 11 times and that the cause of his death was a gunshot wound to his right temple. Additionally, the report established the presence of amphetamines in Mr. Carter's blood at the time of his death. Robert Doyal suffered a shotgun wound to the right side of his torso and his arm "that made multiple lacerations of his external jugular vein, his heart, his pulmonary arteries, his lungs, liver, stomach, duodenum and ilium." The autopsy of Ms. Adams established that she suffered a shotgun wound to the chest as well as a grazing shotgun wound to her head.

Following the presentation of this evidence, the State rested. After a full *Momon* colloquy, the defendant elected to testify.

The 35-year-old defendant testified that he was born in Georgia and came to live in Tennessee in 2005 after his mother was placed in a nursing home in Maryville. The defendant acknowledged prior out-of-state convictions of "making terroristic threats,"

burglary, possession of stolen property, aggravated assault, false imprisonment, and possession of a knife during the commission of a felony. The defendant said that on July 24, 2010, he was working part time at M. Day's Garage and supplementing his income by hanging sheet rock and giving tattoos. He claimed that it was his side business giving tattoos that required him to have the latex gloves that were discovered in Mr. Carter's Dodge Intrepid after the murders. The defendant said that he met Robert Doyal through a mutual girlfriend and Layron Doyal through Mr. McKinney.

The defendant said that he moved into the Doyal residence in mid-September 2009 to assist Mr. Doyal, who had just had surgery, with yard work and other household chores in exchange for a place to live. He testified that during the 15 or 16 days he lived in the Doyal residence, he saw Mr. Doyal with his gun at his side more than he saw him without it. He said that Mr. Doyal answered the door with the gun in his hand during their first meeting and that he carried it in the house and the yard. The defendant said that Mr. Doyal did not keep any pain medication in his house because Robert Doyal would steal it. Instead, he kept the medication in a safe deposit box at the bank. The defendant said that his girlfriend moved in with him briefly but moved out because Mr. Doyal kept coming downstairs unannounced. He testified that he moved out because Mr. Doyal became "more and more persistent on" him and began to drink "more and more."

The defendant said that he maintained his relationship with Robert Doyal even after he moved out of the Doyal residence, explaining that he would pick Robert Doyal up down the street to avoid any confrontation with Mr. Doyal. He said that he met Mr. Carter three weeks before the murder through a mutual girlfriend for whom the defendant had occasionally obtained pain pills.

On July 23, 2010, Mr. Carter came to Ms. Smith's residence and asked the defendant if he could obtain pain pills for Mr. Carter. Ms. Smith, too, asked the defendant to obtain pills for her. The defendant agreed to both requests, and he and Mr. Carter left. The defendant said that he had telephoned Robert Doyal earlier in an attempt to obtain Mr. McKinney's telephone number. He said that he hoped to obtain the pills from Mr. McKinney and to collect on a debt that Mr. McKinney owed him. The defendant claimed that he went to the Doyal residence because the Doyals were "the only other people [he] knew that had Mr. McKinney's number." The defendant said that he and Mr. Carter used Mr. Carter's car and that the defendant drove because Mr. Carter was "pill sick."

The defendant said that he parked across the street from the Doyal residence near a bush so that Mr. Doyal would not be able to see Mr. Carter, and vice versa. He said that he got out of the car and left Mr. Carter in the passenger's seat. The defendant denied being armed when he got out of the car and said that he simply went to the front door of the

residence and knocked. The defendant testified that Ms. Adams answered the door, and he asked to speak to Mr. Doyal. When Ms. Adams told him that Mr. Doyal had gone to bed, the defendant asked to speak to Robert Doyal. Ms. Adams told him to "hold on a minute and turned around and walked off." Shortly thereafter, Robert Doyal came to the door, and the defendant asked him for Mr. McKinney's telephone number. The defendant testified that Robert Doyal told him to "hold on a minute. He needed to get his cell phone." Robert Doyal returned with his cellular telephone and piece of paper and began scrolling through his telephone looking for Mr. McKinney's telephone number. He said that Robert Doyal wrote the number on the piece of paper, and when he went to hand it to the defendant, "everything got turned upside down." He said that as they were exchanging the paper, a shotgun blast went off behind him. The defendant claimed that he pushed Robert Doyal into the house and ran past him as "[a]nother blast went off." When he turned around, he saw Mr. Carter coming through the door with a shotgun. The defendant said that he "just hit the floor" as Mr. Carter fired another shot. He testified that after Mr. Carter walked past him and fired another shot into the hallway, the defendant ran toward the front door. He said that as he ran past the hallway, he was struck by a bullet fired by Mr. Doyal.

The defendant said that he fell briefly before getting up and continuing out of the house to Mr. Carter's car. He said that he got into the car and drove to Ms. Smith's apartment. At Ms. Smith's residence, Mr. and Mrs. Alexander "stripped [the defendant] down and tried to doctor [him] up." The defendant said that he asked them to call his brother instead of the ambulance because he did not want to be arrested. The defendant denied any intent or plans to rob Mr. Doyal on the night of the shooting and insisted that he had gone to the Doyal residence only to obtain Mr. McKinney's telephone number.

During cross-examination, the defendant acknowledged that he displayed the Mossberg shotgun and a .22 caliber pistol to Mr. Alexander in the days before the shooting. The defendant also admitted that he told officers during a July 25, 2010 interview that he had lived in the Doyal residence for three months and that he did not know Robert Doyal by name and had no relationship with him. He also admitted that he told officers that the only member of the household he had seen in the months since he moved out was Mr. Doyal and that he had seen him only once. The defendant also admitted telling officers that he wanted to borrow money from Mr. McKinney and to take pills from Mr. McKinney that he could then resell.

The defendant admitted changing into all-black clothing on the night of the murders and looking for a black bandana to wear. He admitted that he traveled to Blount Memorial Hospital instead of going to another hospital in Knox County.

Following the defendant's testimony, the defense rested. Based upon the proof

presented at trial, the jury convicted the defendant as charged of three counts of first degree felony murder and one count of criminally negligent homicide for the death of Ms. Adams, three counts of first degree felony murder and one count of criminally negligent homicide for the death of Robert Doyal, one count of especially aggravated burglary for breaking into Mr. Doyal's residence and causing serious bodily injury to Ms. Adams, one count of especially aggravated burglary for breaking into Mr. Doyal's residence and causing serious bodily injury to Robert Doyal, one count of the attempted aggravated robbery of Mr. Doyal, and one count of employing a firearm during the commission of a dangerous felony. The jury found the defendant not guilty of the attempted especially aggravated robberies of Ms. Adams and Robert Doyal.

The trial court merged the jury verdicts relative to the murder of Ms. Adams into a single conviction of first degree murder and imposed an automatic sentence of life imprisonment. The trial court also merged the jury verdicts relative to the murder of Robert Doyal into a single conviction of first degree murder and imposed an automatic sentence of life imprisonment to be served concurrently to the life sentence imposed in count 1. The trial court merged the two jury verdicts of especially aggravated burglary into a single conviction and imposed a 30-year, Career Offender sentence to be served concurrently to the life sentence imposed in count 1. The court imposed a 15-year, Career Offender sentence for the conviction of attempted aggravated robbery and ordered that the sentence be served concurrently to the sentence imposed in count 1. Finally, the trial court ordered that the six-year sentence imposed for the defendant's conviction of employing a firearm during the commission of a dangerous felony be served consecutively to the life sentence imposed in count 1. The effective sentence is, therefore, life imprisonment plus six years.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the State engaged in prosecutorial misconduct, that Mr. Doyal's trial behavior deprived him of the right to a fair trial, that the trial court erred by admitting certain testimony, and that the trial court erred by refusing to enforce an agreement between the parties regarding the admissibility of a police report. We consider each claim in turn.

*I. Prosecutorial Misconduct*

*A. Opening Statement*

The defendant first asserts that the State engaged in prosecutorial misconduct during its opening statement by telling the jury that it may or may not hear from the defendant's brother, who was under subpoena by the State. He claims that the statement shifted the burden of proof to the defendant by suggesting that any failure to appear by the

defendant's brother would be the responsibility of the defendant. The State contends that the defendant has waived our consideration of this issue by failing to include in the appellate record a transcript of the opening statements in this case.

We agree with the State. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Because the defendant failed to include the transcript of the parties' opening statements we cannot verify that the prosecutor made the challenged statement or evaluate it in the context of the prosecutor's opening statement as a whole.

*B. Cross-Examination of Defendant*

The defendant next contends that the prosecutor engaged in misconduct by asking the defendant during cross-examination whether he had made plans to rob other people in the weeks preceding the offenses without a good faith basis for doing so. The State asserts that even if it was error, the question was brief, the defendant's answer denied any wrongdoing, and the trial court sustained the defendant's objection to the line of questioning.

In reviewing allegations of prosecutorial misconduct, this court looks to see "whether such conduct could have affected the verdict to the prejudice of the defendant." *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). That analysis involves consideration of five factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In our view, the prosecutor did not engage in misconduct when he asked the

challenged question. The prosecutor argued that he had a good faith basis to ask the defendant whether he and Mr. Carter had made plans to rob other people based upon a statement given by an individual named Tevin Fishback, who had claimed that Mr. Carter attempted to recruit Mr. Fishback to participate in a robbery in the presence of the defendant and that the defendant had nodded his head in agreement. Mr. Fishback's claim of the defendant's silent assent to Mr. Carter's robbery plans provided the prosecutor with a good faith basis to ask the question about the defendant's future robbery plans. After the defendant denied any such plans, the trial court correctly ruled that the prosecutor was "stuck" with the defendant's denial and rightly prohibited any further questioning or extrinsic evidence on the matter. The defendant is not entitled to relief on this issue.

The defendant also claims that the prosecutor engaged in misconduct by utilizing the defendant's brother's statement to police in an attempt to impeach the defendant during cross-examination. During cross-examination, the prosecutor asked the defendant if he had told police at the hospital that he had been shot in the apartment complex where Ms. Smith lived. The defendant stated that he could not recall having told the police anything during that time. Defense counsel objected to the line of questioning on grounds that the basis for the question was actually the defendant's brother's statements rather than the defendant's own statement. In that statement, the defendant's brother told police that the defendant had said that he had been shot while at the apartment complex. In our view, the statement provided the prosecutor with a good faith basis for asking the question of the defendant. The trial court again correctly ruled that the State was bound by the defendant's answer and prohibited any further questioning or extrinsic evidence. The defendant is not entitled to relief on this issue.

### C. Agreement Regarding Police Report

In his final claim of prosecutorial misconduct, the defendant claims that the prosecutor engaged in misconduct by failing to honor an agreement to permit admission into evidence of a police report filed by Mr. McKinney on July 24, 2010. He claims that the prosecutor agreed to permit admission of the report in exchange for the defendant's agreeing to allow one Tennessee Bureau of Investigation Agent to testify from the report prepared by another agent who was scheduled to go on a family vacation at the time of the trial. He asserts that the prosecutor then reneged on the agreement by objecting to the admission of the statement after having received the benefit of the bargain.

During his cross-examination testimony, Mr. Doyal adamantly denied threatening Mr. McKinney in the hours just after the murders. Mr. Doyal acknowledged that he called Mr. McKinney and left a voicemail telling Mr. McKinney about the murders, but he denied calling Mr. McKinney "the son-of-a-b[****] who did it." Defense counsel then

approached the bench and informed the trial court that the State had previously agreed to allow admission of a police report generated by the Sevier County Sheriff's Department when Mr. McKinney telephoned police to report the threat. Counsel explained that in exchange for the State's agreement, the defendant had agreed to let evidence of fingerprint analysis come from a witness other than the one who performed the analysis. The prosecutor acknowledged the prior agreement but stated that Mr. Doyal's testimony on the subject had altered his opinion. He said that Mr. Doyal's testimony made it clear to him that the information about the telephone call would best be related by Mr. McKinney rather than permitting admission of the police report. He said that given his knowledge of Mr. Doyal's hatred of Mr. McKinney, he assumed that Mr. Doyal would admit threatening Mr. McKinney. Because Mr. Doyal denied making the statement, however, the prosecutor argued that Mr. McKinney should be called to testify rather than simply admitting the police report.

The trial court observed that outside an agreement between the parties allowing its admission into evidence, the proffered police report was inadmissible hearsay. The court admonished the prosecutor that "[t]here shouldn't be any reneging of a deal" but noted that the defendant would have to show that he would be prejudiced unless the trial court held the prosecutor to his earlier bargain. The only prejudice claimed by the defendant was that he had questioned Mr. Doyal with a mind that the police report would be admitted. The trial court ruled that there had never been a true meeting of the minds given the prosecutor's assumption about what Mr. Doyal's testimony would be.

In our view, the ruling of the trial court was correct. Although the defendant contends that the parties entered into a *quid pro quo* agreement whereby the defendant would be permitted to admit the report in exchange for his agreeing to permit the substitute testimony, the record does not support this interpretation of the parties agreement. To the contrary, the record establishes that the defendant agreed either prior to or near the beginning of the trial to permit the substitute testimony. Later, when he decided to seek admission of the police report during his cross-examination of Mr. Doyal, defense counsel asked for the prosecutor's agreement on the admission of the police report, making reference to his own "very nice" agreement to permit the substitute testimony. The defendant's asking for the prosecutor's agreement based upon consideration already given does not equate to a *quid pro quo* arrangement. Moreover, at the time the prosecutor objected to the report, none of the forensic witnesses had testified. Thus, the prosecutor had not, as the defendant claims, received the benefit of the defendant's agreement regarding the substitute testimony when he made the objection to the police report. The defendant was free, at that point, to object to the substitute testimony. Finally, the defendant has failed to establish any prejudice stemming from the prosecutor's failure to honor his initial agreement to admit the report. The defendant has failed, under these circumstances, to show that the prosecutor engaged in

any misconduct.

## *II. Mr. Doyal's Behavior*

The defendant next contends that Mr. Doyal's "antics" during direct and cross-examination deprived him of the right to a fair trial.

Just after calling the defendant a "bastard" during his direct examination testimony, Mr. Doyal was overcome with emotion. The trial court *sua sponte* excused the jury and suggested that Mr. Doyal be excused for the day and asked to return the following day to resume his examination. The parties agreed. On the following morning, the prosecutor informed the court that he had spoken with Mr. Doyal's sister, who said that Mr. Doyal had been suffering from chest pains and was contemplating a trip to the emergency room. Mr. Doyal arrived later that day, and the trial court admonished him to alert the court immediately if he felt he could not continue because of his medical condition. Mr. Doyal agreed and notified the court that he had brought a plastic bag in case he felt the need to vomit. Defense counsel noted his concern with the appearance of the witness, and the court replied, "You take your victims as you get them." Defense counsel noted, in particular, that Mr. Doyal was using oxygen when he had not done so on the previous day. Mr. Doyal testified that he had been prescribed supplemental oxygen "for several years" as a result of his chronic obstructive pulmonary disease and that he generally resorted to using the supplemental oxygen when he exerted himself. He said that the physical and emotional exertion of testifying on the previous day had caused him to require the use of the oxygen.

Now on appeal, the defendant claims that Mr. Doyal's emotional breakdown and subsequent appearance with supplemental oxygen was a ruse manufactured by the State to garner sympathy for Mr. Doyal. Initially, we note that the defendant failed to support his argument with citation to appropriate authorities, and, accordingly, the claim is waived. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument, "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities and appropriate references to the record . . . relied on; and . . . for each issue, a concise statement of the applicable standard of review"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Moreover, the defendant's claim is wholly unsupported by the record. Mr. Doyal, in his sixties at the time of the trial, testified that he suffered from the lingering effects of wounds he received during the Vietnam War and a serious motorcycle accident. He testified that in addition to these injuries, he suffered from chronic obstructive pulmonary disease, diabetes, cardiac artery disease, acid reflux, pancreatitis, carpal tunnel syndrome, and neuropathy. His health was so poor, in fact, that he had taken the defendant on as a tenant

-14-

to help with the household chores some two years prior to the trial. On the second morning of the trial, Mr. Doyal's sister reported to the prosecutor that the previous day's testimony had taken a great physical toll on the witness. When he appeared later that day using the supplemental oxygen, he explained that he had been prescribed supplemental oxygen "for years" to use when he exerted himself physically. Finally, the State exhibited to the hearing on the motion for new trial a copy of Mr. Doyal's obituary, which established that Mr. Doyal died only eight months after the trial. In light of this evidence, the defendant's claim that Mr. Doyal's appearance or his use of supplemental oxygen during his second day of testimony was a ruse concocted by the prosecutor or the witness to extract sympathy from the jury is utterly unfounded. As such, he is not entitled to relief on this issue.

### III. Witness Testimony

### A. Patrick Alexander

The defendant asserts that the trial court erred by permitting Mr. Alexander to testify that the defendant had displayed a Mossberg 12-gauge shotgun and a .22 caliber handgun to him in the days before the murder, claiming that the testimony was not relevant given that the State relied on a theory that the defendant was criminally responsible for Mr. Carter's having shot Ms. Adams and Robert Doyal. The State contends that the trial court properly admitted the evidence.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In our view, the trial court did not err by admitting this testimony. That the defendant displayed the weapons in question to Mr. Alexander in the days before the murder established that the defendant knew that the shotgun was in the trunk of the Intrepid and that he was familiar with how to operate the weapon. His possession and display of the murder weapon tied him to the weapon in a manner that made it more likely that he participated in the crime with Mr. Carter.

*B. Melissa Smith*

The defendant also contends that the trial court erred by permitting Ms. Smith to testify that, on the night of the offenses, she asked the defendant to bring her "some of the other" and to explain that "the other" referred to prescription pain killers. He argues that the testimony was irrelevant. The State avers that the trial court did not err by admitting the testimony because it tended to establish that the motive for the robbery was the theft of prescription pain killers.

We agree with the State. Ms. Smith's testimony that the defendant agreed to provide her with prescription pain killers when he returned on the night of the murders supported the State's theory that the object of the home invasion was the theft of pain killers from Mr. Doyal. In consequence, the evidence was relevant, and, given that the reference was relatively brief and limited only to that single occasion, its probative value was not outweighed by any potential prejudice. This is particularly true given that the defendant himself testified that he and Mr. Carter were on the hunt for prescription pain killers.

*IV. Police Report*

In his final claim for relief, the defendant contends that the trial court erred by excluding from evidence a police report that showed that the defendant's brother rather than the defendant told police that the defendant had been shot in Ms. Smith's apartment complex. As indicated above, during its cross-examination of the defendant, the State asked whether the defendant had told authorities that he was shot at Ms. Smith's apartment complex, and the defendant responded that he could not recall telling the police anything during that time period. The trial court ruled that the defendant's brother's statement to police provided the State a good faith basis to ask the question but refused to admit any extrinsic evidence because the statement was not the defendant's own. The defendant then sought admission of the police report to establish that the defendant's brother gave the report to police. The trial court excluded the report on grounds that it was inadmissible hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. "Because '[n]o factual issue attends' the trial court's determination whether a statement is hearsay, 'it necessarily is a question of law.'" *State v. Ackerman*, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012) (quoting *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App.

2005))). "Although the application of the various exceptions to the hearsay rule 'may initially depend upon factual determinations' to which a reviewing court must defer, the trial court 'has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence.'" *Ackerman*, 397 S.W.3d at 638 (quoting *Gilley*, 297 S.W.3d at 760-61). "Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo." *Id.*

The police report proffered by the defendant in this case was the out-of-court statement of the officer who prepared it, making it hearsay, and the defendant's brother's statement contained therein was hearsay within hearsay. The defendant offered no exception that would permit its admission, and we find none. The trial court did not err by refusing to admit the report.

## V. Plain Error

Although not raised by the parties, we notice plain error in the defendant's conviction of especially aggravated burglary. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

The defendant was charged with a total of eight counts of first degree murder for the deaths of Ms. Adams and Robert Doyal. He was also charged with two counts of especially aggravated burglary for breaking into Mr. Doyal's residence and causing injuries to Ms. Adams and Robert Doyal. The trial court merged the jury verdicts into a single conviction of especially aggravated burglary. Tennessee Code Annotated section 39-14-404, proscribing especially aggravated burglary, provides, "Acts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d). Because the defendant was prosecuted for first degree murder for the injuries inflicted on Ms. Adams and Robert Doyal, he could not also be prosecuted for especially aggravated burglary based on those same injuries. *See, e.g.*, *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). In consequence, his conviction of especially aggravated burglary must be modified to conviction of aggravated burglary and remanded for resentencing. *See id.*

## VI. Conclusion

The defendant failed to establish that the prosecutor engaged in misconduct or that the trial court erred in the admission or exclusion of any evidence. Because Code section 39-14-404(d) bars the defendant's conviction of especially aggravated burglary, that

conviction is modified to a conviction of aggravated burglary and remanded for resentencing. The judgments of the trial court are affirmed in all other respects.

_____
JAMES CURWOOD WITT, JR., JUDGE